AUGUST ROBIN, ET AL.              CIVIL ACTION NO.  04-1695

VERSUS                            JUDGE S. MAURICE HICKS, JR.

JACK B. BINION, ET AL.            MAGISTRATE JUDGE HAYES

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment (Record Document 314) filed

by Defendants, Jack B. Binion ("Binion"), Horseshoe Entertainment, L.P., Horseshoe

Gaming Holding Corporation, and New Gaming Capital Partnership, Inc. Defendants move

for summary judgment dismissing all of Plaintiffs' claims on the grounds that there is no

genuine issue of material fact and that they are entitled to summary judgment as a matter

of law.  See id.  Both Plaintiff August "Duke" Robin ("Robin") and the Piper Plaintiffs

oppose the Motion for Summary Judgment.  See Record Documents 369 & 376.  Based

on the following analysis, the Motion for Summary Judgment filed by Defendants is

**GRANTED IN PART** and **DENIED IN PART**.

I.      **FACTUAL BACKGROUND.**[1]

On April 20, 1993, the limited partnership, Horseshoe Entertainment, L.P., was

formed to own and operate the Horseshoe Casino in Bossier City, Louisiana.  The General

---

[1]The Piper Plaintiffs submitted what appears to be disputed legal issues in response
to Defendants' Motion for Summary Judgment.  See Record Document 376-4. In violation
of L.R. 56.2, the Piper Plaintiffs did not submit a filing that specifically demonstrates the
existence of any genuine issues of fact.  Further, the Statement of Undisputed Material
Facts (Record Document 369-19) submitted by Robin deals exclusively with issues
surrounding the Participation Clause and the Stock Purchase Agreement.  Therefore, for
purposes of the Factual Background section of the instant Memorandum Ruling, the Court
has relied heavily, and almost exclusively, on the unchallenged Rule 56.1 Statement of
Material Facts as to Which There is No Genuine Issue to be Tried (Record Document 314
at 3-13) submitted by Defendants.

Partner was New Gaming Capital Partnership ("NGCP") and was controlled by Binion. NGCP owned an eighty-nine percent (89%) interest in Horseshoe Entertainment, L.P. The limited partners of Horseshoe Entertainment, L.P. were Plaintiffs, Robin, Wendell Piper, and Cassandra Piper. A fourth limited partner, Frank Pernici, sold his limited partnership interest to NGCP effective December 31, 1995. Plaintiff Robert Piper claims an ownership interest in Horseshoe Entertainment, L.P. by virtue of the community property existing between him and his wife under Louisiana law.

In return for Robin and Robert Piper's assistance in seeking a Louisiana gaming license, Binion gave the aforementioned limited partnership interests to Robin and Robert Piper. Robert Piper subsequently gave his interest to his wife, Cassandra, and brother, Wendell.

For most of the period from December 1993 to December 1998, Robert Piper served as "local general counsel" for Horseshoe Entertainment, L.P. and received over $2.5 Million in compensation in the form of annual retainers and hourly fees. He continued to represent Horseshoe Entertainment, L.P. on an hourly basis through at least June 2004. Robin also received substantial fees for performing "consulting work" for Binion and other Defendants from May 12, 1992 through December 31, 1998. During that period, Robin, his company, The Robin Group, Inc., and/or his partner, Jody Taylor, were paid over $1 Million in consulting fees.[2]

Both Horseshoe Bossier (Bossier City, Louisiana) and Horseshoe Tunica (Biloxi,

---

[2]The facts set forth in this paragraph are from the Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue to be Tried (Record Document 314 at 3-13) submitted by Defendants. See supra n. 1.

Mississippi) were successful casino ventures. The management team, including Binion, wanted to grow the Horseshoe casino business. On the other hand, the limited partners primarily were interested in current distributions. Over the course of several years, Robert Piper complained about the operations of Horseshoe Casino and alleged violations of the Horseshoe Entertainment, L.P. partnership agreement. Robin was well aware of Robert Piper's many complaints, which included various alleged violations of the partnership covenants: major capital expenditures without the concurrence of the partners; failing to meet every calendar quarter; failing to make quarterly distributions; refusing to give partners tax distributions; using the monies of Horseshoe Entertainment, L.P. for purposes wholly unrelated to the partnership; adding partners without the concurrence of existing partners; the creation of Horseshoe Gaming, Inc., without the approval of the limited partners; the injudicious and unfair expenditure of significant sums from Horseshoe profits; the engagement of unnecessary personnel; the transfer by Binion of his interest in Horseshoe Entertainment, L.P. to another entity without the approval of the limited partners; failing to disburse partnership profits in accordance with an agreed upon formula; commingling Horseshoe funds with those of other entities; conducting the business of Horseshoe Entertainment, L.P. at the meetings of Horseshoe Gaming; mortgaging and encumbering the property of the partnership without the agreement of the limited partners; and dissolving the partnership created by the parties without their consent and in violation of the agreement with Louisiana partnership law.

In October 1995 Horseshoe Gaming, L.L.C. was formed, and all of the owners of interests in Horseshoe Bossier and Horseshoe Tunica, except Plaintiffs and Frank Pernici, exchanged their interests in their respective limited partnerships for an interest in

Horseshoe Gaming. The Pipers and Robin did not exchange their interests because they believed the Horseshoe Entertainment Limited Partnership Agreement, prepared by Robert Piper, gave the Louisiana limited partners greater rights than they would have had in the parent, Horseshoe Gaming. Consequently, up until the time of the sale of their interests in Horseshoe Entertainment, L.P. in April 1999, the Pipers and Robin continued as limited partners of Horseshoe Entertainment, L.P.

In September 1998, Horseshoe Gaming, L.L.C. entered into an agreement to merge with Empress Acquisition Illinois, Inc. and Empress Acquisition, Inc., which, respectively, owned riverboat casino properties in Illinois and Indiana. However, after the Empress merger agreement had been executed, Defendants were informed that the Illinois Gaming Board would not approve the merger if the Pipers and Robin owned any interest in Horseshoe Entertainment, L.P. or any Horseshoe entity. Consequently, on March 19, 1999, the Empress Merger Agreement was amended by the First Amendment to Merger Agreement to provide Empress with the right to terminate that agreement and keep Horseshoe's $10 Million deposit, if the Pipers and Robin were not bought out by May 31, 1999.

Binion informed Robert Piper and Robin that he had to buy them out or he could not close the Empress deal. After months of negotiations, on April 21, 1999 the Pipers and Robin executed Buyout Agreements, pursuant to which they would sell their limited partnership interests in Horseshoe Entertainment, L.P. The Pipers and Robin signed separate agreements, each contingent upon the other's execution of a substantially similar agreement. With the exception of differences in some of the dollar amounts to be paid, including "forgiveness" of loans to the limited partners and the agreement to purchase

Robin's option rights in Horseshoe Tunica, the Buyout Agreements were identical in all material respects. Both Buyout Agreements included a broad mutual release and waiver provision. The cash consideration paid to the Pipers for their release and wavier was $500,000 and the consideration to Robin for his release and waiver was $500,000. Specifically, the release and waiver provisions provided:

7.  <u>Payment of Release and Waiver.</u> In exchange for the release and waiver by Duke [Robin] described in Paragraph 8, Horseshoe Companies shall deliver, upon the Effective Date of this Agreement, to Duke the title, free of any liens to the Horseshoe Entertainment, L.P. car in his possession and on December 15, 1999, the amount of $500,000.00.

8.  <u>Release and Waiver.</u> Except for Group, Duke hereby represents and warrants that he does not now have nor has he ever held any ownership interest in, or position with any other entity of any kind or nature whatsoever, having any claim against Horseshoe Companies or Binion or any of their or his current or former agents, employees, partners, officers, servants, directors, attorneys, affiliates, successors and assigns. Except for the obligation created or reaffirmed by virtue of this Agreement, Duke and Group hereby release, discharge and waive any and all claims, causes of action, and demands of any kind or nature whatsoever that now exist, whether known or unknown, which he may have against the Horseshoe Companies or Binion or any of their or his current or former agents, employees, partners, officers, servants, directors, attorneys, affiliates, successors and assigns. Except for the obligation created or reaffirmed by virtue of this Agreement, the Horseshoe Companies and Binion hereby release, discharge and waive any and all claims, causes of action, and demands of any kind or nature whatsoever that now exist, whether known or unknown, which each may have against Duke or Group or any of his current or former agents, employees, partners, servants, attorneys, successors and assigns.

The Buyout Agreements also contained an integration clause:

27.  <u>Entire Agreement.</u> This Agreement contains the entire Agreement of the parties thereto with respect to the subject matter hereof and shall be deemed to supercede all prior or contemporaneous agreements, representations, and understandings, whether written or oral concerning the subject matter of this Agreement. This Agreement states any and all

payments, debts and obligations of the Horseshoe Companies owed to Duke and there are no other remaining obligations. Except as otherwise provided herein, all terms and provisions of the Partnership Agreement of Horseshoe Entertainment, L.P. in effect as of the execution hereof, shall remain in full force and effect.

Another provision negotiated by Plaintiffs and contained in the Buyout Agreements is the following Participation Clause, or what is often referred to as the Most Favored Nations Clause:

> 6. <u>Participation in Sale by Binion.</u> If, within five years of the date of this Agreement, the Binion Family Interests collectively sells in excess of a 50% interest in Horseshoe Gaming, LLC, for a purchase price consisting of cash, debt or publicly traded securities or any combination thereof having a value of in excess of $5,350,000 per 1% interest sold, then Duke [Robin] shall receive a cash sum equal to 2¼% of the value of the sale in excess of $5,350,000 per 1% sold (such cash sum equal to 2¼% being the "Participation Payment"). For the purposes of this paragraph, the value of the sale shall be equal to (i) the cash purchase price, plus (ii) 80% of the value of the publicly traded securities as determined by the last sales price of such securities at the close of the market upon which such securities are traded, on the date the Binion Family Interests receives such securities, plus (iii) 80% of the present value of the debt. For the purposes of this paragraph, the Binion Family Interests shall mean, Binion or any entities owned or controlled by Binion, or any member of his family or any trust for the benefit of any member of his family. In the event that Duke is are entitled to the Participation Payment, all sums due from Duke to Horseshoe Companies shall be due and payable immediately to the extent of the Participation Payment.

As evidenced by the language quoted above, the Participation Clause granted the Pipers and Robin an opportunity to participate in the proceeds from the Binion Family's sale of more than fifty percent (50%) of their interest in Horseshoe Gaming, L.L.C.; however, that opportunity was limited by certain specific conditions set forth that agreement. The right to participate was triggered upon the sale of more than fifty percent (50%) interest of the Binion Family's interest in Horseshoe, but only if that sale occurred within five (5) years of

the date of the Buyout Agreements, April 21, 1999.

In a "Stock Purchase Agreement" dated September 10, 2003 between HGHC and its shareholders and Harrah's Entertainment, Inc., Harrah's agreed to purchase all of the stock of HGHC at a future date. Sections 1.1 and 1.2 of the Stock Purchase Agreement provided:

> Section 1.1   Basic Transaction.  On the terms and subject to conditions of this Agreement, Parent [Harrah's] agrees to purchase from each Seller, and each Seller agrees to sell to Parent, all of his, hers [sic] or its Shares for the consideration specified below in this Article I.
>
> Section 1.2   Closing. Unless this Agreement has been terminated pursuant to Section 8.1, upon the terms and subject to the conditions set forth in this Agreement, the purchase and sale of the Shares (the "Closing") shall take place at 10:00 a.m., California time, on the third business day after the satisfaction or (to the extent permitted by applicable law and this Agreement) waiver of the conditions set forth in Article VII (other than those conditions to be satisfied or waived at the Closing), at the offices of Latham & Watkins LLP, 650 Town Center Drive, 20th Floor, Costa Mesa, California 92626, or at such other time, date or place agreed to in writing by Parent and the Company.  The date on which the Closing occurs is referred to in this Agreement as the "Closing Date."

Article VII of the Stock Purchase Agreement details the many conditions that had to be satisfied (or waived) before the sale could close, including obtaining various governmental consents to the proposed sale. Article VIII of the Stock Purchase Agreement also specifies numerous circumstances under which the parties could terminate the Agreement. Article VIII(b) of the Stock Purchase Agreement specifically allows termination by either party "if the transactions contemplated hereby shall not have been consummated on or prior to June 11, 2004." This paragraph also goes on to state that the June 11, 2004 date can be extended to as late as September 11, 2004 and refers to this as the "Outside

Date" for the Closing.[3]

In May 2004, Robert Piper and Jack Binion met in a restaurant at the Horseshoe Bossier casino. At that time, Piper asked Binion if he was going to pay him pursuant to the Participation Clause. Binion told him that because the sale to Harrah's had not taken place within the five year term of the Participation Clause, i.e., on or before April 21, 2004, the Pipers were not entitled to any payment under the Participation Clause and Binion was not going to pay him any more money. When all the conditions of the Stock Purchase Agreement had been fulfilled, on July 1, 2004, the purchase and sale of the shares to Harrah's was closed and Harrah's payment to the sellers, via the sellers' representative, was made. By that date, the Participation Clause had expired.

When the Pipers did not get any money from the sale to Harrah's, Robert Piper met and/or conferred with Jamie Perdigao ("Perdigao"), a Louisiana lawyer with the firm of Adams & Reese. These communications occurred from May 2004 until August 2004. Perdigao was the Louisiana attorney who represented Horseshoe in virtually all Louisiana gaming regulatory matters. The Horseshoe entities had paid Perdigao and his law firm millions of dollars for their representation over the years. Despite such representation, and Piper's own legal representation of Horseshoe Entertainment, L.P., Robert Piper collaborated directly with Perdigao in developing and drafting the original petition (complaint) filed in this matter. Piper paid $25,000.00 to Adams & Reese for Perdigao's assistance in developing this lawsuit.

---

[3]Interestingly, the 1999 Buyout Agreements do not contain a similar "extension" provision. The parties to the 1999 Buyout Agreements were free to bargain for, or attempt to bargain for, such a provision at any time.

## II.    PROCEDURAL BACKGROUND.

Plaintiffs filed their complaint on July 27, 2004 in the First Judicial District Court, Parish of Caddo, State of Louisiana.  <u>See</u> Record Document 1.  Defendants filed a Notice of Removal, seeking to have the case removed to this Court, on August 12, 2004.  <u>See</u> Record Document 4.  A Removal Order was entered on August 23, 2004.  <u>See</u> Record Document 6.

On November 16, 2004, Defendants answered the complaint and also filed a counterclaim against Plaintiff Robin.  <u>See</u> Record Document 28.  Plaintiff Robin answered the counterclaim on January 31, 2005 and later filed a First Supplemental and Amended Answer to Counterclaim.  <u>See</u> Record Documents 36 & 89.  Late in 2005, both Plaintiff Robin and the Piper Plaintiffs filed amended complaints.  <u>See</u> Record Documents 91 & 96.  Defendants filed their answers to both Amended Complaints in December 2005 and January 2006.  <u>See</u> Record Document 100 & 108.  Then, Robin again amended his complaint in July 2006 and Defendants answered in August 2006.  <u>See</u> Record Documents 270 & 326.

In October 2005, this Court ruled on multiple magistrate appeals and refereed several discovery disputes.  These occurrences prompted this Court to "monitor and manage this case for the foreseeable future," meaning that all motions, including any motions relating to discovery, were set before the District Judge, as compared to the Magistrate Judge.  <u>See</u> Record Document 81.

All parties to the instant action filed motions for summary judgment or partial summary judgment.  On July 13, 2006, Plaintiff Robin filed a Motion for Partial Summary Judgment.  <u>See</u> Record Document 210.  The Piper Plaintiffs filed their own Motion for

Partial Summary Judgment on August 17, 2006.  See Record Document 318.  Also on August 17, 2006, the Defendants filed the instant Motion for Summary Judgment, seeking dismissal of all of Plaintiffs' claims.  See Record Document 314.  Discovery continued after these dispositive motions were filed.

According to the most recent scheduling order entered in this case, the above-captioned matter is set for a pretrial conference on January 5, 2007 and a jury trial on January 22, 2007.  See Record Document 346.

## III.   LAW AND ANALYSIS.

### A.   Summary Judgment Standard.

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c);  New York Life Ins. Co. v. Travelers Ins. Co., 92 F.3d 336, 338 (5th Cir. 1996).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); see also Gunaca v. Texas, 65 F.3d 467, 469 (5th Cir. 1995).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting Celotex, 477 U.S. at 323-25, 106 S. Ct. at 2552).  If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."

Little, 37 F.3d at 1075.

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Wallace v. Texas Tech Univ., 80 F.3d 1042, 1046-47 (5th Cir. 1996). The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. Little, 37 F.3d at 1075; Wallace, 80 F.3d at 1047. Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Wallace, 80 F.3d at 1048 (quoting Little, 37 F.3d at 1075); see also S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." McCallum Highlands v. Washington Capital Dus, Inc., 66 F.3d 89, 92 (5th Cir. 1995), as revised on denial of rehearing, 70 F.3d 26 (5th Cir. 1995). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-51, 106 S. Ct. 2505, 2511 (1986).

In order to determine whether or not summary judgment should be granted, an examination of the substantive law is essential. Substantive law will identify which facts are material in that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id.

With these principles in mind, the Court now turns to a review of the claims at issue.

**B.     Claims in the Main Demand.**

**1.     Release.**

Both the Piper Buyout Agreement and the Robin Buyout Agreement contain an express, negotiated release and waiver provision for which each group was paid a half a million dollars.  The language in both agreements is identical:[4]

> 8.     Payment of Release and Waiver.   In exchange for the release and waiver  described in Paragraph 9, Horseshoe Companies shall deliver the aggregate amount of $500,000 to the Pipers on January 15, 2000.
>
> 9.     Release and Waiver. . . .  [E]ach of the Pipers hereby releases, discharges and waives any and all claims, causes of action and demands of any kind or nature whatsoever that now exist, whether known or unknown, which he may have against the Horseshoe Companies or Binion . . . .

Record Document 376, Exhibit 8, ¶¶ 8-9.

Louisiana Civil Code Article 3071 states, in pertinent part:

> A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.
>
> This contract must be either reduced into writing . . . .

La. C.C. Art. 3071.  Under Louisiana law, "a release of a claim executed in exchange for consideration received is, in effect, a compromise."  Brown v. Drillers, Inc., 93-1019 (La. 1/14/94), 630 So.2d 741, 747.

Defendants maintain that the broad release and waiver language in the 1999 Buyout Agreements establishes that, as a matter of law, each of the Plaintiffs clearly released and

---

[4]Out of convenience, the Court is quoting from only one of the Buyout Agreements, the Piper Buyout Agreement.

waived any and all claims known or unknown which they may have had as of April 21, 1999. Thus, Defendants moved for summary judgment, seeking the dismissal of any such known or unknown claims. In support of their Motion for Summary Judgment, Defendants rely on Ingram Corporation v. Jay Ray McDermott & Co., Inc., et al., 698 F.2d 1295 (5th Cir. 1983). Ingram involved a plaintiff who sought to vitiate a release that contained broad and express language[5] several years after it had been executed by asserting that the defendant had failed to disclose an existing, on-going anti-trust conspiracy during the negotiations leading up to the execution of the release. The Fifth Circuit affirmed summary judgment in favor of defendants, stating:

> When a release provides that "any and all claims," "past, present, or future" are to be extinguished, a court is required to enforce its provisions both as to known and unknown claims. A contrary result would not contribute significantly to the public policy of encouraging the settlement of differences

---

[5]The releases in dispute in the Ingram case provided:

[Plaintiff] has remised, released, and forever discharged, and by these presents does, for itself and for its successors and assigns, remise, release and forever discharge [Defendant] and each and every one of [its] past and present officers, directors and stockholders and each of them, and their respective heirs, executors, administrators, successors and assigns, of and from all manner of actions, causes of actions, suits, debts, dues, sums of money, accounts, reconings [sic], bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, controversies, Judgments, executions, claims and demands whatsoever in law, in admiralty, or in equity which against them or any of them, [Plaintiff] or its successors or assigns hereafter can, shall or may have, in its own right or in a representative capacity, for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of these presents, including without limitation of the generality hereof, any past, present or future claims, matters, causes or things that [Plaintiff] has or may hereafter have arising out of, based upon or in any way relating to the Purchase Agreement, the Subcontract Agreement, and the Agreement regarding INGRAM DERRICK BARGE NO. 6, dated November 16, 1971, by and between [Plaintiff] and [Defendant] . . . and the transactions contemplated thereby, . . . .

Ingram Corp., 698 F.2d at 1311.

and compromise of disputes in which the execution and exchange of releases is the common and legally accepted means of consummation.

Id. at 1312. Defendants' argue that Ingram, a case much more complex than the instant matter, supports their request for summary judgment based upon the fact that Plaintiffs previously signed releases which unambiguously released Defendants from all claims, known or unknown, existing at the time of the execution of the 1999 Buyout Agreements.

Conversely, the Piper Plaintiffs maintain that they "did not waive the breach of fiduciary claims and the litany of other breaches of the partnership agreement by the defendants." Record Document 376 at 10. The Piper Plaintiffs argue that because the subject complaints relate to breach of fiduciary obligations and duties and because they did not learn of such claims until 2004 and/or after the institution of the instant lawsuit, the express release and waiver in the 1999 Buyout Agreements is not applicable.[6] Specifically, the Piper Plaintiffs point to two Louisiana cases, W. A. McMichael Const. Co. v. D & W Properties, Inc., 356 So.2d 1115 (La.App. 2 Cir. 1978) and Barksdale v. Lincoln Builders, Inc., 32,857 (La.App. 2 Cir. 6/21/00), 764 So.2d 223. The Piper Plaintiffs rely on W. A. McMichael Const. Co. for the following principle:

> The fiduciary duty of the partners is particularly applicable when one partner seeks to purchase the interest of another partner. Such a sale will be sustained only when it is made in good faith, for a fair consideration, and on a full and complete disclosure of all important information as to value. This duty of disclosure holds true despite the fact that the relations between the partners have become strained or in conflict. The fiduciary duty continues through the sale or purchase of a partner's interest or through termination and liquidation of the partnership.

---

[6]Piper stated that he first learned of the alleged fraudulent activities of Binion and alleged breaches of fiduciary obligations by Binion during discussions with Jamie Perdigao in July 2004 and/or after the institution of the instant lawsuit. See Record Document 376 at 11.

W. A. McMichael Const. Co., 356 So.2d at 1122. W. A. McMichael Const. Co. is also cited by the Piper Plaintiffs for the reasoning that "whether based on fraud, presumptive or constructive fraud, error, or equitable principles, Louisiana courts have consistently set aside transactions or otherwise afforded effective relief where a fiduciary secured an unfair advantage by failure to disclose material information to the principal's detriment." Id. at 1124. The Piper Plaintiffs rely on Barksdale to argue that a partner who does not have knowledge of breaches of fiduciary duties lacks the requisite intent to release the fiduciary for the prior breaches of duties and the fiduciary may not profit by such a release. See Record Document 376 at 22.

Based on the aforementioned jurisprudence, the Piper Plaintiffs argue that the release and waiver in the 1999 Buyout Agreements is not effective as to their claims for breach of fiduciary duty. Such argument is based on their belief that Binion knew, and they did not, that "the $12 million total price he paid for plaintiffs' 8.08[%] interest in the Horseshoe was unfair and wrong" and because "Binion breached his fiduciary obligation by mortgaging their property without their consent and spending their money for matters wholly unrelated to Plaintiffs." Record Document 376 at 20, 23.

The Court has closely scrutinized the Piper Plaintiffs' argument with respect to the interplay between the release and waiver language in the 1999 Buyout Agreement and their claims for breach of fiduciary duties. It appears to the Court that the Piper Plaintiffs' are essentially attempting to void the release and waiver due to purported unfair dealings on the part of Binion. Yet, this Court finds that in light of the substantial monetary consideration paid (and accepted) without reservation for such release and waiver, the Piper Plaintiffs are still bound by the release and waiver provision in the 1999 Buyout

Agreement.

With respect to the strong public policy favoring compromise agreements, this Court echos the sentiments of the <u>Ingram</u> court and believes that embracing the Piper Plaintiffs' argument would undermine that policy. The Court also notes another provision of the 1999 Buyout Provision that supports its finding that the Piper Plaintiffs are bound by the release and waiver. Paragraph 10 states, in pertinent part, that "the Pipers specifically waive any objection or claim arising as a result of, or in any way related to, the efforts of Binion or the Horseshoe Companies to purchase or finance additional gaming or related operations including but not limited to gaming and related operations in Hammond, Indiana or Joliet, Illinois." Record Document 314, Exhibit 2, ¶ 10. This provision further evidences the intent of the parties with respect to the compromise and release and that such release was to include any and all claims, causes of action or demanded relating to events, known or unknown, occurring prior to April 21, 1999.

Further, the Court agrees with Defendants that the cases of <u>W. A. McMichael Const. Co.</u> and <u>Barksdale</u> are factually distinguishable from the instant case. In the former case, the managing general partner did not disclose an important lease agreement which he had in hand and explained his failure to disclose with the flippant comment of "I was out there to buy them out, not to given them a progress report." <u>W. A. McMichael Const. Co.</u>, 356 So.2d at 1119. In <u>Barksdale</u>, the Court was concerned that the limited partners did not understand the significance of the general partners' actions which jeopardized the financial well-being of the partnership. <u>See</u> <u>Barksdale</u>, 764 So.2d 223. Here, all Plaintiffs admit that the 1999 Buyout Agreements were entered into after several months of negotiations and there is no competent summary judgment evidence indicating that Binion had superior

knowledge or information. Again, the Court considers the business acumen of not only Binion, but also Robert Piper, a licensed Louisiana attorney actually representing Horseshoe and who was well versed in the casino and gaming industry. Robin also admitted in his deposition that the Buyout Agreement was negotiated, that he was involved in the negotiations, and that felt that "the partnership agreement gave us [the Plaintiffs] a lot of strength in negotiating the buyout." Record Document 314, Exhibit 8 at p. 113-114.

Finally, the Court considered the multiple claims, which were in most instances very specific, made by Plaintiffs constantly alleging wrongdoings of Defendants over virtually the entire course of their ownership in Horseshoe Entertainment, L.P. Such repetitive and virtually unceasing claims strongly evidence that the Piper Plaintiffs were clearly aware of many claimed wrongdoings, including alleged violations for the partnership covenants, and after months of negotiations and bargaining, voluntarily waived any and all claims based on the alleged mismanagement or claimed wrongdoings.

Accordingly, the Court finds that summary judgment in favor of Defendants is appropriate and any claims that existed as of April 21, 1999, including claims for breach of fiduciary duties and obligations, are dismissed.[7] Plaintiffs signed releases which unambiguously released Defendants from all claims, known or unknown, existing at the time of the execution of the 1999 Buyout Agreements. The language of those releases is clear and should be given its intended effect.

---

[7]Such ruling necessarily requires that the Piper Plaintiffs' request for judgment sua sponte with respect to the issues of fact relating to Binion's fiduciary duties, which is contained in Record Document 376 at 76-78, be **denied**.

## 2. Claims of Fraud in Inducement and of Misrepresentation.

At the outset, the Court notes that the aforementioned ruling on the release and waiver issue includes Plaintiffs' claims for fraud, as such claims existed as of April 21, 1999. However, out of an abundance of caution, this Court will engage in analyzing the merits of the fraud claims.

Plaintiffs allege that Binion made misrepresentations to them to induce them to sell and that he misrepresented the value of Horseshoe Entertainment, L.P. when they sold their interest in that company. Defendants have moved for summary judgment on these claims of fraud in inducement and of misrepresentation on the grounds that there was no fraud and, alternatively, that any fraud claims are prescribed.

Fraud is "a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." La. C.C. Art. 1953. Fraud requires a showing of intent. See St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425 (5th Cir. 2000); Pellerin Const. Inc. v. Whitco Corp., 169 F.Supp.2d 568 (E.D.La. 2001). "Negligence is, in no sense, the synonym of fraud or dishonesty." Anders v. J. L. Evans & Co., 187 So. 109, 111 (La.App. 2 Cir. 1938).

Plaintiffs first fraud claim is based on their belief that Binion lied to them about his need to buy their interest in Horseshoe Entertainment, L.P. and thereby committed fraud. But, the undisputed record evidence is that Binion received information from representatives of the Indiana and Illinois regulatory bodies that he would not obtain regulatory approval in Indiana and Illinois if Plaintiffs continued to be his partners in Louisiana. See Record Document 314, Exhibit 9 at pp. 138-140. This evidence is supported by the First Amendment to the Empress Merger Agreement, which added a

provision requiring Cassandra and Wendell Piper's and Robin's limited partnership interests be purchased by Horseshoe no later than May 31, 1999 or Empress would terminate the agreement and Horseshoe would lose its $10 Million deposit. See id., Exhibit 12 at 2, 4. Plaintiffs have not shown, and would be hard pressed to show, a genuine issue of material fact on the issue of whether Binion lied to them about his need to buy their interest in Horseshoe Entertainment, L.P., as they have no testimonial or documentary evidence that disputes Binion's stated belief that he would not obtain regulatory approval in Indiana and Illinois if Plaintiffs continued to be his partners in Louisiana. In fact, the only competent summary judgment evidence on this issue, i.e., the First Amendment to the Empress Merger Agreement, unequivocally supports Binion's position.

The second fraud claim alleges that Binion misrepresented the value of Horseshoe Entertainment, L.P. when Plaintiffs sold their interest in that company. To prevail on a claim of fraudulent misrepresentation, the plaintiff must demonstrate "material misrepresentations committed by one party with the design to deceive another to obtain an unjust advantage or to cause loss or inconvenience to the other." Murphy's Lease & Welding Service, Inc. v. Bayou Concessions Salvage, Inc., 2000-978 (La.App. 3 Cir. 3/8/01), 780 So.2d 1284, 1288 (La.App. 3 Cir.,2001). The plaintiff must establish both an intent to defraud or gain an unfair advantage and resulting loss or damage. See id.

Again, as to the second fraud claim, the Piper Plaintiffs have not shown, and are unable to show with competent summary judgment evidence, that Binion or any of the other Defendants misrepresented the value of Horseshoe Entertainment, L.P. Further, under Louisiana law, "misrepresentation does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty,

inconvenience, or special skill." <u>Sonnier v. Boudreaux</u>, 95-2127 (La.App. 1 Cir. 5/10/96), 673 So.2d 713, 718 (citations omitted). Here, Robert Piper was a sophisticated businessman, a practicing attorney, and was Horseshoe Entertainment, L.P.'s local general counsel. Robin was also a sophisticated businessman and had served as a consultant to Binion in Louisiana and assisted in Horseshoe's pursuit of gaming opportunities in other states. Based on their work experiences dealing with legal and financial matters, this Court finds that these Plaintiffs had the opportunity and the ability to determine, for themselves, the approximate fair market value of the interests they were selling. Along these same lines, Plaintiffs' attempt to prove unfair advantage and resulting loss or damage is questionable, as their powerful negotiating position under the Piper-drafted partnership agreement, enabled them to likely extract significantly more than the fair market value of their limited partnership interests in Horseshoe Entertainment, L.P. as well as a five year Participation Clause. <u>See</u> Record Document 314, Exhibit 17 (Expert Report of Houlihan Lokey Howard & Zukin) & Exhibit 16 (Affidavit of Sandy Purcell, the Review Appraiser for Houlihan Lokey Howard & Zukin) (The reports evidence that Plaintiffs received more than the fair market value of their interests in Horseshoe Entertainment, L.P. when they sold their interests. The Houlihan Lokey report shows that the 8.08% equity interest in Horseshoe Entertainment, L.P. owned by Plaintiffs had a fair market value on April 21, 1999 of $9,914,160.00, far less than the amount Plaintiffs actually received in the Buyout Agreements).

Finally, the Court does note that in response to Defendants' well plead Motion for Summary Judgment, the Piper Plaintiffs contend that "the salient issue is whether the defendants induced the plaintiffs to get out on the basis of a promise to pay them more

down the road." Record Document 376 at 25. Further, they maintain that "it is clear that the sole inducement to plaintiffs to agree to the buyout was the promise of future payments under the Most Favored Nations Clause. . . . But for plaintiffs desire to assist him [Binion] in this endeavor [pursuing deals in other jurisdictions] and because of his promise to make sure they were paid what was due upon the sale of Horseshoe, plaintiffs would have never agreed to the buyout." Id. at 28. Plaintiffs' response is unpersuasive. Any oral promise from Binion for future payments would have been superseded by the 1999 written Buyout Agreements, which include the Participation Clause. Further, the Piper Plaintiffs have not pointed to any competent summary judgment evidence that Binion committed the fraud alleged. Likewise, the Piper Plaintiffs have not pointed to any admissible evidence to create a genuine issue for trial regarding Binion's intent to honor his agreement under the Participation Clause. At this stage in the litigation, conclusory allegations are simply not enough. Accordingly, summary judgment in favor of Defendants is granted as to Plaintiffs' fraud claims.[8]

### 3. Oral Contract Claim.

As part of their amending complaint, Plaintiffs allege that sometime after entering into their Buyout Agreements, Binion made an oral promise to buy out the Most Favored Nations Clause of their Buyout Agreements. See Record Document 91, ¶ 20(E). Plaintiffs

---

[8]Further, the Court also concludes that Plaintiffs' fraud claims are prescribed. Plaintiffs had asserted the fraud claims many times over the years prior to the April 21, 1999 Buyout Agreements. In Louisiana, the prescriptive period for actions based on fraud is one year from the date the injury or damage is sustained. See La. C.C. Art. 3492. Plaintiffs obviously knew about their allegations of fraud prior to April 1999 and they have no credible basis now for arguing suspension or interruption of the prescriptive period. Thus, Plaintiffs' fraud claims related to actions which allegedly took place before Plaintiffs sold out not only have been released, they have also prescribed.

contend that such oral promise was not contingent upon the sale of the business. <u>See id.</u>

Plaintiffs also allege that Binion agreed to pay them $3.6 million based on the sale of the Illinois casino and "another sum upon the sale of the three (3) remaining casinos under the favored nations agreement." <u>Id.</u>, ¶ 20(C). Plaintiffs allege that the aforementioned sum was not paid because "Binion decided to wait until an accurate valuation could be made of the other three (3) vessels at which time a lump sum payment would be made reflecting the value of all four (4) casinos." <u>Id.</u>, ¶ 20(D).

According to Robert Piper's deposition testimony, he believed that Binion was going to buy out the Most Favored Nations Clause, even if there was not a sale, due to conversations he had with Binion and other representatives of Defendants. <u>See</u> Record Document 314, Exhibit 4 at pp. 89-92. Robert Piper admitted in his deposition that there was no written agreement concerning Binion's oral promise to buy out the Most Favored Nations Clause. <u>See id.</u>

Conversely, Robin testified during his deposition that he would not have negotiated with Lacy Johnson, one of the Defendants' representatives Robert Piper claimed to have a conversation with regarding Binion's oral promise to buy out the Most Favored Nations Clause. <u>See id.</u>, Exhibit 5 at p. 60. Robin stated that he dealt with Binion only. <u>See id.</u> at p. 61. When asked if Binion ever offered to pay him $3.6 million (or $1.6 million to the Pipers and $1.6 million to Robin), Robin stated that if Binion did, he did not agree to it and he would never have agreed to accept such sums for a buy out of the Most Favored Nations clause. <u>See id.</u> at p. 62. And while Robin testified that Binion told him he would buy out the Most Favored Nations provision, he could not recall when those promises were made. <u>See id.</u> at pp. 65-66. Significantly, Robin testified that Binion did not offer a price

because "I don't think he knew at the time." Id. at p. 66.

Binion himself recalled that Plaintiffs expressed a desire to "get their money early on not waiting for the Most Favored Nations clause to be triggered by a sale." Id., Exhibit 9 at p. 250. Binion also conceded that the $1.8 million figure had been discussed, but that he thought this was in reference to "the buyout for the whole thing," as compared to Robert Piper's desire to "do a partial buyout of [the Buyout Agreement]." Id. at p. 252. Binion further testified that no buyout ever "came to fruition." Id.

Defendants argue that summary judgment is appropriate on the oral promise claim on several grounds: (1) Plaintiffs cannot carry their burden of proving the existence of the alleged oral promise by Binion under Louisiana Civil Code Article 1846 and (2) the oral promise claim fails because Plaintiffs cannot establish two essential elements for formation of a contract – price and consent. See Record Document 314 at 27-30.

The Piper Plaintiffs argue that summary judgment is inappropriate[9] and maintain that "the commitment made by Mr. Binion is clear and unambiguous; and the reason for the commitment is clear and unambiguous. Consistent therewith, the promise must necessarily be enforced." Record Document 376 at 42. They contend that "it is indisputable that an oral contract existed between the parties" and place great weight on the fact that it was Binion's "custom and practice to operate via verbal commitments and agreements sealed with a handshake." Id. at 46.

The Court disagrees and finds, as a matter of law, that there was no enforceable oral contract for Binion to buy out the Plaintiffs' interest in the Most Favored Nations provision.

_____

[9]Plaintiff Robin made no response to the portion of Defendants' Motion for Summary Judgment relating the oral promise claim.

Louisiana Civil Code Article 1846 applies to the Piper Plaintiffs' claim of an oral contract with Binion. Article 1846 states:

> When a writing is not required by law, a contract not reduced to writing, for a price or, in the absence of a price, for a value not in excess of five hundred dollars may be proved by competent evidence.
>
> If the price or value is in excess of five hundred dollars, the contract must be proved by at least one witness and other corroborating circumstances.

The second paragraph of Article 1846 governs in the instant case. The Piper Plaintiffs designate Binion as their "one witness" and argue that their "other corroborating circumstances are evidenced by the plaintiffs' admissions that they did not want out of the deal, but that they only got out to assist in the acquisition of the Empress property." Record Document 376 at 45. They also rely on a letter from Binion's attorney to Evan Migdail. See id. at 44. According to the Piper Plaintiffs, the letter states that Horseshoe and Robin are in the process of negotiating a buyout of Robin's rights under the Most Favored Nations Clause and it is anticipated that an agreement will be finalized shortly. See id.[10]

The Piper Plaintiffs' reliance on Binion as their "one witness" is misplaced, as he unequivocally testified that although there were discussions with Robert Piper regarding a buyout, those discussions never reached fruition. See Record Document 314, Exhibit 9 at p. 252. Thus, Binion's testimony is not supportive, but rather contradictory to an enforceable oral contract under Louisiana law. And while corroborating evidence under Article 1846 may be general and need not prove every detail of the plaintiff's case, the evidence must in some way corroborate the allegations of the Piper Plaintiffs. See Hall v. Turner, 500 So.2d 853, 855 (La.App. 1 Cir. 1986). Here, after a careful examination of the

---

[10]The letter is referenced as Exhibit 82.

record, the Court simply does not find the existence of any "other corroborating circumstances" to the extent that the requirement of Article 1846 is fulfilled.  See id.  For instance, Plaintiffs seem to offer Binion's claimed routine business practice of handshake agreements as a corroborating circumstance, but this Court finds that such practice is not the type of evidence envisioned by Article 1846 and is irrelevant to the legal determination presently before this Court.  Likewise, even what at first glance appears to be the Piper Plaintiffs' most reliable evidence – the letter which references negotiations which anticipated a buyout agreement in the future – is not corroborative.  It simply parallels Binion's testimony of negotiations regarding a possible buyout of the Most Favored Nations Clause. It does not support the conclusion that such an agreement was completed and/or is enforceable.  The same rationale applies to the other claimed corroborating circumstances offered by the Piper Plaintiffs.[11]

Further, independent of the analysis under Article 1846, this Court also doubts the Piper Plaintiffs' ability to establish the required elements of price and consent as to Binion's alleged oral contract to buyout the Most Favored Nations provision.  At trial, the Piper Plaintiffs would bear the burden of proof in establishing an enforceable oral contract.  Thus,

_____

[11]The Court points to Paragraph 24 of the Piper Buyout Agreement, which states:

24. Modification.  This Agreement ma y not be amended, modified or altered except by written instrument duly executed by all of the parties hereto.

Record Document 314, Exhibit 2 at 7.  The Piper Buyout Agreement also contains an integration clause that unquestionably incorporates all of the terms of the agreement among the parties on the subjects addressed, including the Most Favored Nations Clause. The Court finds that such provisions are in direct contravention of Plaintiffs' claim that an oral contract/promise made by Binion existed and that such oral contract modified the provisions of the Most Favored Nations Clause.

to avoid summary judgment, they must demonstrate a genuine issue of material fact on the issues of price and consent. Under Louisiana Civil Code Article 2439, the basic requirements for the existence of a contract are: (1) the thing; (2) the price; and (3) the consent of the parties. The latter two requirements are inter-connected. In the absence of an agreement as to price, there is no consent, and no contract that can be given legal effect. See First Nat. Bank of Ruston v. Mercer, 448 So.2d 1369 (La. App. 2 Cir. 1984).

Here, the Piper Plaintiffs admit that no price had been determined. In their opposition brief, they state:

> [T]he most favored nations' provision in the absence of a sale of business, had a value which had to be discounted. The parties **were looking to reach a valuation** with an appropriate discount. Before they could do so, Binion reached an agreement to sell the business to Harrah's.

Record Document 376 at 44 (emphasis added). Robin also testified in his deposition that Binion did not offer a price for the buy out because "I don't think he knew [a price] at the time." Record Document 314, Exhibit 5 at p. 66. With these admissions, it is clear that no agreement as to price was ever reached in connection with a complete buy out of Plaintiffs' rights under the Most Favored Nations Clause. With no agreement as to price, it naturally follows that the parties could not consent. Thus, there was never an enforceable oral contract for Binion to buy out the Plaintiffs' rights under the Most Favored Nations Clause.

Based on the foregoing analysis, the Court finds that summary judgment in favor of Defendants is appropriate as a matter of fact and law as to Plaintiffs' oral contract claim.[12]

---

[12]In their opposition brief, the Piper Plaintiffs also reference their detrimental reliance claim, which is addressed in another ruling by this Court.

### 4. Interpretation of the Harrah's/Horseshoe Stock Purchase Agreement.

Defendants and Plaintiff Robin disagree as to whether the Harrah's/Horseshoe Stock Purchase Agreement, signed on September 10, 2003, was a contract of sale or a contract to sell and whether such purchase agreement triggered the Participation Clause/Most Favored Nations Clause in the 1999 Buyout Agreements. All parties seem to agree the aforementioned issues present questions of law that can be decided at the summary judgment stage.

The Robin Buyout Agreement was entered into by Defendants and Robin on April 21, 1999. See Record Document 314, Exhibit 3, ¶ 6. Paragraph 6 of the Robin Buyout Agreement contains what is referred to as a Participation Clause or a Most Favored Nations Clause, which states:

> Participation in Sale by Binion. If, within five years of the date of this Agreement, the Binion Family Interests collectively sells in excess of a 50% interest in Horseshoe Gaming, LLC, for a purchase price consisting of cash, debt or publicly traded securities or any combination thereof having a value of in excess of $5,350,000 per 1% interest sold, then Duke [Robin] shall receive a cash sum equal to 2¼% of the value of the sale in excess of $5,350,000 per 1% sold (such cash sum equal to 2¼% being the "Participation Payment"). For the purposes of this paragraph, the value of the sale shall be equal to (i) the cash purchase price, plus (ii) 80% of the value of the publicly traded securities as determined by the last sales price of such securities at the close of the market upon which such securities are traded, on the date the Binion Family Interests receives such securities, plus (iii) 80% of the present value of the debt. For the purposes of this paragraph, the Binion Family Interests shall mean, Binion or any entities owned or controlled by Binion, or any member of his family or any trust for the benefit of any member of his family. In the event that Duke [Robin] is entitled to the Participation Payment, all sums due from Duke [Robin] to Horseshoe Companies shall be due and payable immediately to the extent of the Participation Payment.

Id. An identical provision is also contained in the Piper Buyout Agreement.

The Harrah's/Horseshoe Stock Purchase Agreement was entered into by Harrah's Entertainment, Inc., HGHC, and each of the stockholders of HGHC on September 10, 2003. See id., Exhibit 14. The Stock Purchase Agreement contains the following language at Section 1.2:

> *Closing.* Unless this Agreement has been terminated pursuant to Section 8.1, upon the terms and subject to the conditions set forth in this Agreement, the purchase and sale of the Shares (the "Closing") shall take place at 10:00 a.m., California time, on the third business day after the satisfaction or (to the extent permitted by applicable law and this Agreement) waiver of the conditions set forth in Article VII (other than those conditions to be satisfied or waived at the Closing), at the offices of Latham & Watkins LLP, 650 Town Center Drive, 20th Floor, Costa Mesa, California 92626, or at such other time, date or place agreed to in writing by Parent and the Company. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date."

Id., § 1.2. The Closing Date as referred to in Section 1.2 of the Stock Purchase Agreement occurred on July 1, 2004. See id., Exhibit 15. Five years from the date of the Robin Buyout Agreement, i.e., April 21, 1999, would be April 21, 2004.

There is no dispute that July 1, 2004, the closing date, was outside of the five year window of the Most Favored Nations Clause. Thus, the issue becomes whether the Stock Purchase Agreement, which was entered into during the five year window, was sufficient to trigger the Most Favored Nations Clause. Both Plaintiffs and Defendants have presented expert evidence on this precise issue.

Plaintiff Duke Robin has presented the expert opinion of Louisiana State University Law Professor Saul Litvinoff, who opined that the Stock Purchase Agreement was a contract of sale. Notwithstanding, Professor Litvinoff stated that "the issue of whether the Stock Purchase Agreement [was] classified as a sale or a contract to sale [was] nothing more than a red herring, since under either approach Robin is entitled to a price

supplementation under the participation clause of the 1999 Agreement." Record Document 369, Exhibit 9. Professor Litvinoff concluded that the word "sells" in the Participation Clause encompasses both a contract of sell and a contract to sale. See id.

Defendants have presented the expert opinion of Tulane University Law Professor Vernon Palmer, who opined that the Stock Purchase Agreement of September 10, 2003 was a contract to sell and that the Most Favored Nations Clause would only be triggered by an actual sale, not a mere contract to sell. See id., Exhibit 6. Thus, he concluded that the conditions of the Most Favored Nations Clause were not satisfied within the required 5 year period and that no participation payment was owed to Robin. See id.

The Court found that the dueling experts were helpful in their debate of the fine points of Louisiana obligations law. Nonetheless, the Court has performed its own legal analysis. The word "sells" in Paragraph 6 is undefined and the Court must turn to Louisiana obligations law for guidance. Louisiana law draws a bright-line distinction between a contract to sell and a contract of sale. Louisiana Civil Code Article 2623 states that "an agreement whereby one party promises to sell and the other promises to buy a thing at a later time, or upon the happening of a condition, or upon performance of some obligation by other party, is a bilateral promise of sale or contract to sell." Louisiana Civil Code Article 2439 states that a "sale is a contract whereby a person transfers ownership of a thing to another for a price in money." Louisiana jurisprudence reflects that an agreement to sell is not a sale where the execution of a later final act of sale is contemplated by the parties. See Webb v. Young, 338 So.2d 767 (La.App. 4 Cir. 1976). Federal courts sitting in Louisiana have also noted that "Louisiana law is long and uniform to the effect that a contract to sell at a future time is not a sale . . . ." Hillhaven Corporation v. Schweiker, 570

F. Supp. 248 (M.D. La. 1983).

Here, the Court has examined the plain language of Paragraph 6 of the Buyout Agreements and finds that the language contemplates and describes an actual sale, not a mere contract to sell. For instance, Paragraph 6 sets forth a specific method for determining the "value of the sale" and such method requires the sale to have actually occurred. Hence, the valuation of the "Participation Payment" cannot even be determined unless a "sale" in fact occurred. Moreover, Paragraph 6 states that the transfer must have "a value of in excess of $5,350,000 per 1% sold," which again leads this Court to the conclusion that the parties intended that an actual sale must occur within the five year time period to trigger the Participation Payments.

Because the Court has found that the language used in the Participation Clause is clear and unambiguous, no further interpretation of the Participation Clause is permitted in search of the parties' intent. See La. C.C. Art. 2046 (stating that "when the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."); see also Hawco Manufacturing Co., Inc. v. Superior Chain, Inc., 1998-1037 (La.App. 1 Cir. 9/24/99), 754 So.2d 1062, 1066, and Ransom v. Camcraft, Inc., 580 So.2d 1073, 1077 (La.App. 4 Cir. 1991). The words, and the context of such words, of Paragraph 6 refer to an actual sale, and this Court will not create ambiguity where none exists. Further, the Court believes that interpreting the Participation Clause in a way that would allow a contract to sell in the future to trigger the Participation Clause would be a perversion of the express language contained in Paragraph

6.[13]

Further, the Court finds that the Stock Purchase Agreement of September 10, 2003 was a contract to sell under Article 2623, not a contract of sale under Article 2439. In making this ruling, the Court was most impressed by Sections 1.1 and 1.2 of the Stock Purchase Agreement. Section 1.1 states that "Parent agrees to purchase from each Seller and each Seller agrees to sell to Parent . . . ." Record Document 314, Exhibit 14, § 1.1. Section 1.2 provides that "the purchase and sale of the Shares (the "closing") shall take place on the third business day after the satisfaction or . . . waiver of the conditions set forth in Article 4 . . . ." Id., § 1.1. Such provisions clearly suggest a contract to sell, as compared to a contract of sale. The record evidence establishes the Stock Purchase Agreement was

---

[13]Plaintiff Robin relies on Paragraph 22 of the Buyout Agreement in support of his contention that "the acceptance of a bona fide offer to purchase" would trigger the Participation Clause/Most Favored Nations Clause. Record Document 369 at 8. Paragraph 22 provides, in pertinent part, that "within thirty (30) days of acceptance of a bona fide offer to purchase in excess of 50% of the ownership of Horseshoe Gaming, LLC, Horseshoe Gaming, LLC shall provide Duke [Robin] with a copy of such bona fide offer, except as prohibited by an confidentiality agreement imposed or required by the offer." Under Louisiana Civil Code Article 2050 (each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole), Robin argues that the "bona fide offer" language should be extended to Paragraph 6.

The Court disagrees. Paragraph 22 is more of a catch-all provision and nothing in the aforementioned language provides or suggests that a "bona fide offer" will trigger the Participation Clause. Rather, the only obligation that results from the quoted language of Paragraph 22 is a notice obligation in that Defendants must provide a copy of the bona fide offer to Robin. Further, the parties were free to include "bona fide offer" language in the Participation Clause. Yet, based on the plain language of that clause, the parties clearly chose not to include such a phrase.

Robin also relies upon Section 3.3(b) for principle that the Stock Purchase Agreement itself refers to the Participation Clause of the April 21, 1999 Buyout Agreement. See Record Document 369 at 16-17. Yet, such reliance is misplaced as the Section 3.3(b) referenced by Robin is actually part of the Disclosure Letter, not the Stock Purchase Agreement.

a contract preparatory to the actual sale of the HGHC stock. The agreement sets forth many conditions that had to be satisfied or waived before the sale could close and also provided numerous circumstances under which the parties could terminate the agreement. These are the classic characteristics of a contract to sell, as the agreement evidenced a promise to sell and a promise to buy a thing (stock) at a later time. Based on this reasoning, the Court concludes that the September 10, 2003 Stock Purchase Agreement between Harrah's and HGHC was a preliminary contract to sell, not a sale with suspensive conditions. Moreover, because the closing date of such agreement occurred on July 1, 2004, there was no actual sale sufficient to trigger the Most Favored Nations Clause on or before April 21, 2004.

Accordingly, the Court finds as a matter of law that the Participation Clause/Most Favored Nations Clause requires an actual completed sale; that the September 10, 2003 Stock Purchase Agreement was a contract to sell, not a contract of sale; and that the July 1, 2004 closing of the Stock Purchase Agreement, which did constitute a sale, occurred outside of the five year window of the Most Favored Nations Clause. Hence, no Participation Payments are due to Plaintiffs from Defendants under the Most Favored Nation Clause and summary judgment in favor of Defendants is granted.[14]

### 5.    Rescission of Buyout Agreements.

In their complaint, Plaintiffs seek a judicial declaration that they are the current owners of their limited partnership interests in Horseshoe Entertainment, L.P. because

---

[14]The Court is cognizant of the fact that its ruling is consistent with the opinion of defense expert, Professor Palmer. But again, the Court notes that conflicting views of the experts was helpful in examining certain portions of Louisiana obligations, but the Court nonetheless performed its own legal analysis independent of the expert opinions.

approval of the Buyout Agreements by the Louisiana Gaming Control Board ("LCGB") was required but never obtained. See Record Document 1, ¶¶ 23-25. Defendants have moved for summary judgment on this claim. The parties do not dispute that Defendants, through their then legal counsel, filed a Petition to Modify Ownership with LGCB on September 27, 1999 which requested approval of the Buyout Agreements. Likewise, there does not appear to be a dispute that an accompanying cover letter dated September 23, 1999 asked that the request be placed on the Board's agenda and considered together with Horseshoe's license renewal hearing. Such cover letter contained two signatures, one of which was Robert Piper's. Later, in March 2000, Defendants filed an Amended Petition to Modify Ownership with the LCGB.

In support of their position that rescission of the Buyout Agreements is inappropriate, Defendants point to a LGCB hearing held on March 18, 2003 regarding the Horseshoe Entertainment license renewal. According to Defendants, the transcript of such hearing demonstrates that the LGCB was well aware of the Buyout Agreements and, interestingly, the Piper Plaintiffs have not challenged this point. Defendants further note that up until the filing of the instant lawsuit, Plaintiffs have always acted as if the Buyout Agreements were valid. In fact, Plaintiff Robert Piper's signature can be seen on many filings submitted to the LGCB asking for approval of the Buyout Agreements months and months after the transactions were consummated in April 1999. Further, on June 9, 2004, Plaintiff Robin filed an objection with LGCB regarding the Harrah's purchase of Horseshoe. See Record Document 314, Exhibit 6, Tab T (Exhibit 192 at ¶ 12). In that objection, he stated:

> The Buyout Agreement was specifically approved by this Honorable Board and is clearly in keeping with the public policy of the statute governing gaming in the State of Louisiana.

Id.

This Court is not challenging the plain language of certain Louisiana statutes, namely

La. R.S. 27:68(B) & (E). Section 68(B) states, in pertinent part:

> [T]he sale, assignment, transfer, pledge, or disposition of a security or securities which represents five percent or more of the total outstanding shares issued by a corporation that holds a license is conditional and ineffective if disapproved by the division.

Section 68(E) states, in pertinent part:

> [A]fter a license is granted, any person acquiring five percent or more in the total outstanding shares of a licensee or a five percent or more economic interest in a licensee is required to obtain the division's approval prior to such transaction. Failure to obtain division approval of a transfer is grounds for license revocation.

The plain language of Section 68(B) provides that the disposition of an interest in a casino licensee is ineffective if *disapproved* by the Division. In this case, there is no dispute that the Division, now the LGCB, never disapproved the April 21, 1999 transfers by Plaintiffs. Section 68(E) provides that a person acquiring five percent or more in interest must obtain the Division's approval prior to such transaction. In this case, while there is no dispute that the LGCB was well aware of the 1999 Buyout Agreements, the LGCB never expressly approved the 1999 transfer. Yet, under Section 68(E), the only sanction for failing to obtain the approval is license revocation.[15] Nothing in the statute suggests that an acquisition without express LGCB approval vitiates the transfer itself. Thus, under the aforementioned Louisiana statutes, there is no valid claim for rescission or voiding the Buyout Agreements. And other than making an argument based in Louisiana public policy, the Piper Plaintiffs

_____

[15]In the years since the 1999 transfers, the LGCB has not revoked nor sought to revoke Horseshoe Entertainment's license.

have cited no evidence or law in support of their position that the April 21, 1999 Buyout Agreements should be rescinded because Defendants allegedly did not receive appropriate approval from the Louisiana Gaming Control Board.

Further, Louisiana law forbids relief to a claimant who, through his own acts or omissions, causes the problem about which he complains. See e.g., Standard Life and Accident Insurance Company v. Pylant, et al., 424 So.2d 377 (La. App. 2d Cir. 1983) (stating that "it is well settled that our law does not allow one to profit from his own wrongdoing . . . ."). Here, Plaintiff Robert Piper, a licensed Louisiana attorney who served as local general counsel for Horseshoe Entertainment, L.P., failed to follow up on the original and amended petitions filed with LGCB. His failure is in many ways fatal to Plaintiffs' claim that the Buyout Agreements should be rescinded, as he should not benefit from his failure to act, which quite possibly contributed to the LGCB's failure to formally approve the 1999 transfers. This "doctrine of unclean hands" is another basis for awarding summary judgment in favor of Defendants on this issue.

Based on the foregoing, summary judgment in favor of Defendants is granted as to Plaintiffs' request to rescind the April 1999 Buyout Agreements based on the LGCB's failure to formally approve such agreements.

### 6.    Claims Under La. R.S. 51:1401.

In Paragraph 29 of their complaint, Plaintiffs allege that "the acts and practices of the defendants . . . constitute unfair and deceptive trade practices within the meaning of La. R.S. 51:1401 et seq." Record Document 1, ¶ 29. Plaintiffs are clearly alleging a violation of the Louisiana Unfair Trade Practices and Consumer Protection Law (" LUTPA" or "the Act"). Section 1405 of the Act states that "unfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." La. R.S. 51:1405(a). Section 1409 provides a private cause of action under the Act:

> Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages. If the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the attorney general, the court shall award three times the actual damages sustained. In the event that damages are awarded under this Section, the court shall award to the person bringing such action reasonable attorney fees and costs. Upon a finding by the court that an action under this Section was groundless and brought in bad faith or for purposes of harassment, the court may award to the defendant reasonable attorney fees and costs.

La. R.S. 51:1409(A). Louisiana courts have held that Section 1409 "is apparently penal in nature and subject to reasonably strict construction." National Gypsum Co. v. Ace Wholesale, Inc., 98-1196 (La.App. 5 Cir. 6/1/99), 738 So.2d 128, 130 (citation omitted). Further, the personal right of action under Section 1409 "has been held to apply only to direct consumers or to business competitors." Id. (citations omitted).

In their Motion for Summary Judgment, Defendants argue that the relationship between Plaintiffs and Defendants cannot seriously be considered to fall within the category of direct consumer or business competitor. See Record Document 314-2 at 42. Defendants further contend that any claim under Section 1409 for any act that occurred more than a year prior to Plaintiffs' filing of their lawsuit on July 27, 2004 has prescribed. See La. R.S. 51:1409(E) (stating that "the action provided by this section shall be prescribed by one year running from the time of the transaction or act which gave rise to this right of action."); see also Crowe v. Smith, 848 F.Supp. 1248, 1257 (W.D.La. 1994) (noting Section

1409(e)'s one year peremptive limitations period).

Conversely, the Piper Plaintiffs[16] contend they have standing to sue under the Act because they were business competitors. <u>See</u> Record Document 376 at 66. Specifically, the Piper Plaintiffs state:

> The undisputed facts in the record are that the plaintiffs were involved in the gaming industry prior to their involvement with Mr. Binion. Mr. Piper testified that he and his wife were part owners of Southwest Gaming, a video poker entity that they operated in 1992 immediately prior to teaming with Mr. Binion in 1993.
> In the roll up of October 1995, Jack Binion and his new entity Horseshoe Gaming, became the competitors of the limited partners. Horseshoe Entertainment lost its identity with the roll up; and plaintiffs lost their ability to influence decisions affecting their business. Horseshoe Gaming became the decision maker and all decisions affecting Horseshoe Entertainment were made by Horseshoe Gaming.

<u>Id.</u> at 66-67. Likewise, the Piper Plaintiffs argue that if they were not potential competitors, the Buyout Agreements at issue in this case would not contain non-competition convenants. <u>See id.</u> at 73. They further maintain that their claims under the Act are not time barred because "Defendants have withheld information and failed to disclose the fraudulent acts from the Plaintiffs regarding their unfair trade practices." <u>Id.</u>

Like Defendants, this Court finds the Piper Plaintiffs' argument that for over four years they were both limited partners and competitors with Horseshoe Entertainment to be bizarre at best. <u>See</u> Record Document 394 at 18. Further, that argument is simply unsupported by case law, namely <u>Tessier v. Moffatt</u>, 93 F.Supp.2d 729 (E.D.La. 1998). In <u>Tessier</u>, the plaintiffs were fourteen of the original thirty-four limited partners and owners of a minority interest in a limited partnership, while the defendants were the managing general

---

[16]Plaintiff Robin made no response to the portion of Defendants' Motion for Summary Judgment relating the unfair and deceptive practices claim.

partner, the remaining general partners, certain of the limited partners and the managing general partner's counsel.  See id. at 731 -732.  The Tessier defendants challenged the plaintiffs' standing under the LUTPA, asserting that the plaintiffs were "business partners with the defendants rather than competitors or consumers."  Id. at 733-734.  Conversely, the plaintiffs maintained that "they [were] consumers because they purchased partnership units from the defendants and that they [were] competitors" because a new limited partnership created by several of the defendants "was in direct competition with [the previously formed limited partnership]."  Id. at 734.  In regards to the plaintiff's claim that they were business competitors, the Tessier court stated:

> The plaintiff-partners have not alleged facts to support an allegation that they, as individuals, are business competitors within the meaning of LUTPA.  In order to qualify as business competitors, the individual partners must actually or potentially engage in business that competes directly or indirectly with MMP.  LUTPA is patterned after the Federal Trade Commission Act, and the language closely tracks 15 U.S.C. § 45(a) of the federal statute. In addressing the meaning of business competitor in the federal statute, the United States Supreme Court has stated:
>
>> It is obvious that the word "competition" imports the existence of present or potential competitors, and the unfair methods must be such as injuriously affect or tend thus to affect the business of these competitors-that is to say, the trader whose methods are assailed as unfair must have present or potential rivals in trade whose business will be, or is likely to be lessened or otherwise injured. Federal Trade Commission v. Raladam Company, 283 U.S. 643, 649, 51 S.Ct. 587, 75 L.Ed. 1324 (1931).
>
> Unlike the individual partners, HMC does meet the definition of competitor because it, like MMP, engages in the business activity of developing and renting medical office space.  However, the plaintiff-partners may not bring an action in a representative capacity on behalf of the HMC partnership under LUTPA. . . .  Thus, the plaintiff partners do not have standing to bring suit as limited partners or as representatives of the partnership.

Id.

Here, the Court finds that Plaintiffs were not business competitors of Defendants. From 1993 to 1999, Plaintiffs were limited partners, some of the Plaintiffs provided consulting services for Defendants, and Robert Piper served as local general counsel for Horseshoe Entertainment, L.P. for approximately five years. These facts indicate "faithful and successful service" with Defendants, not competition. Bollinger v. Tanner Companies, LP, No. Civ.A. 02-3248, 2003 WL 1824836, *1 (E.D.La. April 7, 2003). Further, the Tessier decision provides particular guidance in that it deals with limited partners, who claim to be business competitors under the LUTPA, asserting claims against general partners. As in Tessier, Plaintiffs, as limited partners, simply have not proved facts to support an allegation that they, as *individuals*, are business competitors of Defendants within the meaning of the LUTPA. In claiming to be business competitors, Plaintiffs cannot rely on any right they may have in their representative capacity as limited partners to bring such an action. And while Robert Piper testified that he and his wife were "part owners" of Southwest Gaming, a video poker entity that they participated in 1992 immediately prior to teaming with Binion in 1993, such position does not automatically qualify them as business competitors due to the vast differences in the video poker industry and the riverboat casino gaming industry. Plaintiffs offered no proof of the monetary value of their Southwest Gaming interest as compared to the value of their Horseshoe interests. Simply put, any purported unfair and/or deceptive trade practices in relation to the riverboat casino business committed by Defendants would not necessarily injuriously affect or even tend to affect Robert Piper's and/or his wife's involvement in or ability to engage in a business related to video poker.

Notwithstanding, even if this Court assumed for purposes of the instant

Memorandum Ruling that the Piper Plaintiffs were business competitors, their claims under the LUTPA are perempted. Plaintiffs did not file the instant lawsuit until 2004, almost ten years after the October 1995 roll up and over five years after the April 21, 1999 Buyout Agreements. Again, Louisiana courts "have consistently held that LUTPA is a peremptive rather than prescriptive statute." Tessier, 93 F.Supp.2d at 737. "A peremptive statute . . . totally destroys the previously existing right with the result that, upon expiration of the prescribed period, a cause of action no longer exists to be enforced." Pounds v. Schori, 377 So.2d 1195, 1198 (La.1979). Peremptive statutes do not allow for interruption or suspension; thus, any claim under the LUTPA that arises more than one year prior to filing suit is perempted. See Tessier, 93 F.Supp.2d at 737. Thus, Plaintiffs' claims regarding the roll up and loss of identity in 1995 and claims that Binion exploited their partnership interests prior to 1999 are perempted since the instant lawsuit was not filed until 2004.[17] Summary judgment in favor of Defendants is appropriate as to Plaintiffs' claims under the LUTPA.

### 7. The Piper Plaintiff's Claim of Revoked "Comp" Privileges.

Paragraph 15 of Plaintiffs' complaint alleges:

The Pipers also entered into an oral agreement regarding "comp" privileges at the Horseshoe Casino in Bossier City. . . . Binion orally promised to grant "comp" privileges to the Pipers for as long as Binion was the principal owner of the casino. [T]he comp privileges were revoked shortly after the handshake agreement was made. When Robert Piper objected to Binion, Binion caused the privileges to be reinstated, but only for a short period. Thereafter, despite Binion's specific oral agreement to the contrary, the privileges were permanently revoked, all of which caused anguish and embarrassment to the Pipers and a loss of a significant economic benefit.

---

[17]The Piper Plaintiffs made no argument that Defendants engaged in continuing torts that enlarge the period for filing their LUTPA claims. And while the Court could interpret the allegations made as continuing torts from 1995 to 1999, there is no allegation that suggests application of the continuing tort theory past 1999.

Record Document 1, ¶ 15. Defendants do not dispute Binion's oral promise for Robert Piper to continue to be "comped" at Horseshoe Bossier after April 21, 1999, so long as Binion was in control. Record Document 314-2 at 43. Yet, Defendants maintain that Binion never revoked those privileges. See id. During his deposition, Binion testified (under questioning by Robert Piper) that he was not aware of problems with the Pipers' comps, but that he knew Robert Piper had said there were some problems, meaning that on some occasions there was a "snafu" where the Pipers had to pay for their own meals and/or they had problems getting their meals paid for. See Record Document 376, Exhibit 15 at p. 238. The question and answer between Robert Piper and Binion proceeded as follows:

> Q. I like the word snafu, and the snafu was not caused by you, was, Mr. Binion?
> A. No.
> Q. Because you didn't expect for [Plaintiffs] to come and pay for a meal at the Horseshoe?
> A. No.

Id. at 238-239. Based on this deposition testimony, Defendants argue that summary judgment is appropriate because if Binion was not even aware of any "snafus" with the Pipers' comp privileges after April 21, 1999, then he could not have broken his comp privileges agreement with the Pipers. See Record Document 314-2 at 43.

The Piper Plaintiffs contend that even though Binion denied knowing of the "snafus," he was aware of the Pipers' troubles regarding post-April 21, 1999 comp privileges because he was informed of such troubles by Robert Piper. See Record Document 376-1 at 74. The Piper Plaintiffs contend that Robert Piper's comp privileges were reinstated at one point only to be discontinued again in direct violation of his agreement with Binion. See id. In light of these facts, the Piper Plaintiffs argue that summary judgment is inappropriate. See

id. at 74-75.

There appears to be a genuine issue of material fact regarding Binion's awareness of the Pipers' problems concerning comp privileges. In his deposition, Binion stated that he was not aware of the comp problems. See Record Document 376, Exhibit 15 at p. 238. Yet, Binion then goes on to testify that he knew Robert Piper had said there were some problems regarding comps. See id. The Court is unsure whether Binion's testimony means he learned of the problems relating to comp privileges from Robert Piper while the problems were ongoing or if he learned of the problems after the fact, i.e., during the course of the instant litigation. Further, the Court is faced with record evidence that Robert Piper, personally, made Binion aware of the problems concerning his comps. Such factual confusion surrounding the issue of awareness is material, as Binion's awareness of any problems regarding comp privileges may affect his potential liability for violation of the handshake agreement regarding comp privileges in place between Binion and the Piper Plaintiffs. Accordingly, summary judgment on the issue of revocation of comp privileges must be denied and the Piper Plaintiffs' claim for revocation of comp privileges remains.

## C.    Defendant Horseshoe Entertainment, L.P.'s Counterclaim Against Robin.

In its counterclaim against Robin, Horseshoe Entertainment, L.P. asked this Court to award him $550,000, plus interest from April 15, 2003 and attorneys fees. Such claim is based on provisions contained in Paragraph 2 of Robin's Buyout Agreement, which states that Robin owes Horseshoe Entertainment, L.P. $550,000 and that such amount shall be paid on or before April 15, 2003. See Record Document 314, Exhibit 3, ¶ 2. To date, Robin has made no  payment on the $550,000 debt.

On April 7, 2003, Kirk Saylor, CFO of Horseshoe gaming Holding Corporation, wrote

to Robin and reminded him that under Paragraph 2 of the Buyout Agreement, he was required to remit the balance owed of $550,000 on or before April 15, 2003. <u>See id.</u>, Exhibit 6, Tab R (Exhibit 80). Even in light of this amicable demand, Robin failed to pay the amount of the note. In his deposition, Robin admitted that he had not paid the $550,000, stating:

> Q. Did you - did you ever pay the $550,000 called for in that letter?
> A. No, sir.
> Q. Why not?
> A. Because I – I – this $550,000 was a draft from an agreement that we were – that I was going to be paid in the future, so, I – I was going to – we were going to – I was going to settle in. He owed me money, I owed him money.
> Q. Who is he?
> A. Mr. Binion.
> Q. Did you ever discuss that with Mr. Binion?
> A. No, sir. We was at a point where we wasn't discussing things.

<u>Id.</u>, Exhibit 5 at p. 148. Based on this record evidence, Defendants argue that there is no genuine issue of material fact with respect to the $550,000 debt and that Binion is entitled to summary judgment in his favor, and against Robin, in the amount of $550,000.00, plus interest from April 15, 2003, attorneys fees and all costs.

Conversely, Robin argues that "there is a question of fact concerning whether this amount [the $550,000 debt] is even owed because Jack Binion has, as a matter of law, breached the agreement under the Participation Clause [the Most Favored Nations Clause]." Record Document 369 at 21. According to Robin, his obligation to pay $550,000 to Binion was only an obligation to pay a "draw" on future payments owed to him under the Most Favored Nations Clause. <u>Id.</u> No provision in the written agreement characterized the obligation as a "draw." It is in fact a debt for a specific sum owed by Robin. Robin contends that Binion has "breached the very heart of the consideration given for" the Buyout Agreement and that he cannot ask for one term of the contract to be enforced to the

exclusion of others. Id. Further, Robin maintains that under Louisiana Civil Code Article 2015,[18] that the April 21, 1999 Robin Buyout Agreement, which includes Robin's obligation to pay $550,000, has been dissolved due to Binion's failure to pay under the Most Favored Nations Clause of the Agreement. See id. at 22.

The Court finds Robin's arguments unpersuasive. The Court has previously ruled in the instant Memorandum Ruling that Plaintiffs' claims of fraud fail and that Binion did not violate, and that no Participation Payments are due under, the Most Favored Nations Clause, as the contract of sale between Harrah's and Horseshoe occurred in July 2004, a date well outside of the five year window in the Most Favored Nations Clause. Further, the Court notes that Paragraph 2 of Robin's Buyout Agreement, which recites both forgiveness of certain loans and the $550,000 indebtedness, makes no internal reference to the Participation Clause/Most Favored Nations Clause. Rather, Paragraph 2 states that the $550,000 will become due and payable on April 15, 2003, over a year before the deadline for triggering the Participation Clause. Simply put, Robin's "draw" argument fails because this Court has held that Defendants owe no Participation Payments to Plaintiffs under the Most Favored Nations Clause. Likewise, Robin's reliance on Article 2015 is misplaced because Binion did not fail to perform under the Most Favored Nations Clause, rather the

---

[18]Article 2015 states:

Upon a party's failure to perform, the other may serve him a notice to perform within a certain time, with a warning that, unless performance is rendered within that time, the contract shall be deemed dissolved. The time allowed for that purpose must be reasonable according to the circumstances.

The notice to perform is subject to the requirements governing a putting of the obligor in default and, for the recovery of damages for delay, shall have the same effect as a putting of the obligor in default.

Harrah's/Horseshoe sale occurred outside of the five year window of the Most Favored Nations Clause.

The Court finds no genuine issue of material fact regarding Robin's $550,000 indebtedness, which is clearly past due and payable. Accordingly, Horseshoe Entertainment, L.P. is entitled to summary judgment in its favor, and against Robin, in the amount of $550,000 plus interest, attorneys' fees and costs.

### D. Late Named, Unserved Defendants.

In their Motion for Summary Judgment, Defendants note that while Plaintiffs sued Horseshoe Gaming, LLC and Horseshoe Gaming, Inc. in their second amended complaints, neither has ever been served. See Record Document 314-2 at 44. Therefore, pursuant to Local Rule 41.3W,[19] Defendants ask that those defendants be dismissed from the instant action. See id.

The Piper Plaintiffs, the only Plaintiffs to respond to Defendants' request for dismissal, maintain that Horseshoe Gaming, LLC and Horseshoe Gaming, Inc. are shell corporations of Horseshoe Entertainment. See Record Document 376 at 75. Therefore, they argue that Binion is the principal agent for each of these entities and that service as to the original defendants is valid service upon the shell corporations. See id.

The Court disagrees with the Piper Plaintiffs' argument, for which no citation was

_____

[19]LR 41.3 W states, in pertinent part:

A civil action may be dismissed by the clerk of court or any judge of this court for lack of prosecution as follows:

A.    Where no service of process has been made within 120 days after filing of the complaint.

provided. Accordingly, because neither Horseshoe Gaming, LLC nor Horseshoe Gaming, Inc. have been served, both entities are dismissed pursuant to Local Rule 41.3W.

## III.     CONCLUSION.

Based on the foregoing, the Motion for Summary Judgment (Record Document 314) filed by Defendants, Jack B. Binion, Horseshoe Entertainment, L.P., Horseshoe Gaming Holding Corporation, and New Gaming Capital Partnership, Inc., be and is hereby **granted in part** and **denied in part**. All of Plaintiffs' claims, except the Piper Plaintiffs' claim for revocation of comp privileges, are **dismissed**. As to the counterclaim in this matter, the Court enters judgment in favor of Horseshoe Entertainment, L.P., and against August "Duke" Robin, in the amount of $550,000 plus interest, attorneys' fees and costs. Finally, pursuant to Local Rule 41.3W, Horseshoe Gaming, LLC and Horseshoe Gaming, Inc. are dismissed.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 4th day of January, 2007.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE